Laramore, Judge,
delivered the opinion of the court:
This case comes before us on a second appeal, this time by defendant, from a decision of the Indian Claims Commission.[1] The Commission found, after remand (which is discussed later), (1) that the average value of plaintiff’s (hereinafter referred to as the Tribe) land was $5.50 per acre; (2) that the difference between such value and what was actually paid ($2.97) was so gross as to be unconscionable; and (3) that, therefore, pursuant to clause (3) of 25 U.S.C. § 70a (1964)[2] the Tribe is entitled to recover additional consideration in the principal amount of $1,387,911. The Commission also found that the Tribe was entitled to recover interest on the aforementioned principal amount at the rate of five percent per annum from August 15,1894, the date the lands were originally ceded by the Tribe to the defendant. The defendant appeals not only the question last noted involving interest but also appeals the Commission’s method of determining that the ceded land had a fair market value of $5.50 per acre. Furthermore, the defendant questions the validity of our remand of the case to the Commission after the case was first heard by this court. There is no cross-appeal by the Tribe.
*494 The history of this case shows that the initial decision by the Commission, IS Ind. Cl. Comm. 184 (1964), found the fair market value of the ceded land[3] to be $4.00 per acre and the discrepancy between such value and the price originally paid not to be so gross as to be unconscionable and, therefore, the Tribe could not recover under the Act. Following that decision, the Tribe appealed to this court. Nez Perce Tribe of Indians v. United States, 176 Ct. Cl. 815 (1966), cert. denied, 386 U.S. 984 (1967).
On said appeal by the Tribe we concluded that the case should be remanded to the Commission pursuant to 25 TJ.S.C. § 70s(b). We pointed out in our decision, supra, that it was the considered opinion of the court that after reviewing the record it was possible that the lands in question had a fair market value greater than $4.00 per acre. The specifics of that determination will be discussed below.[4] We also decided that even if the Commission had found in favor of the Tribe on the unconscionability of consideration issue, the Tribe still could not recover interest on any additional amount awarded them. Our reasons for that holding are set forth not only at 176 Ct. Cl. 817, 829-830, supra, but we shall also set forth again those reasons hereafter.
We shall now deal with the case for the second time and do so in relation to those points raised on appeal by the defendant as noted earlier. In addition, we shall discuss a question concerning a portion of the original amount paid which was not heretofore dealt with in particular. In the end we will again remand the case to the Indian Claims Commission.

I. The Question of Interest

As noted above, the Indian Claims Commission, in their second opinion, awarded the Tribe interest on the principal recovery at five percent per annum from the date of ratifi *495 cation of the original agreement, August 15,1894, to the date of payment.[5] This amounts to $5,222,015.14 since computation is based upon the additional recovery of $1,387,911, over and above the amount originally paid, $1,626,222. From the opinion of the Commission, 22 Ind. Cl. Comm. 53, swpra, it appears that the decision to award the additional interest was based on a combination of several factors. One of those factors is the Commission’s interpretation of that portion of the original agreement wherein the government agreed to pay interest on the monies due the Tribe.
That original agreement noted above provided, in addition to the total consideration to be paid, that the government would also pay interest on the amount which remained on deposit at the Treasury after the initial principal payment of $626,222. Because this agreement is significant in relation to the interest on the additional sum found to be due the Tribe by the Commission, we shall quote that part which specified the interest payment:
* * * the sum of six hundred and twenty-six thousand two hundred and twenty-two dollars shall be paid to said Indians per capita as soon as practicable after the ratification of this agreement. The remainder of said sum of one million six hundred and twenty-six thousand two hundred and twenty-two dollars shall be deposited in the Treasury of the United States to the credit of the “Nes Perces Indians, of Idaho,” and shall bear interest at the rate of five per centum per annum, which principal and interest shall be paid to said Indians per capita as follows, to wit: * * *.
It is from this part of the original agreement, together with the Commission’s interpretation of the Supreme Court’s decision in The Peoria Tribe of Oklahoma, et al. v. United States, 390 U.S. 468 (1968), r'vg, 177 Ct. Cl. 762, 369 F. 2d 1001 (1966), that we feel the Commission decided the Tribe in this case is entitled to interest. With this decision we cannot agree.
The Commission below acknowledged that we dealt adversely with the interest question in our first opinion but felt *496 that the Peoria case, supra, which was decided after our first Nez Perce case, supra, provided a basis upon which interest could be awarded notwithstanding what was called “judicial dictum” to the contrary.[6]
In Peoria, the Supreme Court reversed our earlier opinion (177 Ct. Cl. 762, 369 F. 2d 1001 (1966)) wherein we concluded that the Peoria Tribe was not entitled to interest on the amount awarded in addition to that amount provided by the Treaty of May 30,1854,10 Stat. 1082. The details of that decision can be found at the above-noted citation (390 TJ.S. 468). The pertinent facts in relation to this case are that in the case of the Peoria Tribe a treaty originally provided that the lands taken should be sold at auction and the proceeds turned over to the Tribe. (Art. 4, Treaty of May 30, 1854, 10 Stat. 1082.) Article 7 of the same treaty also provided that if any amounts were not paid over to the Peoria Tribe, those amounts would be invested for the benefit of the Peoria Tribe and the interest paid annually.
Notwithstanding the provisions of the above-noted Treaty of 1854, the government sold most of the lands at private sale which brought lower prices than could have been received if the sales were by auction. Therefore, both the Indian Claims Commission, at 15 Ind. Cl. Comm. 123 (1965), and this court, 177 Ct. Cl. 762, supra, found that the Peoria Tribe was entitled to recover money damages for a breach of the obligation to sell at public auction. It was also decided by this court, Judges Durfee and Davis dissenting, that the Peoria Tribe was not entitled to recover interest on the recovery. To this latter decision the Tribe sought a writ of certiorari, and the same was granted.
The Supreme Court decided, 390 U.S. 468, 473, supra, that both the Indian Claims Commission, and this court, erred in not awarding additional damages for the government’s “failure to invest the proceeds that would have been received had the United States not violated the treaty * * The Court went on to intimate that these additional damages could be computed by using the rate of interest applicable *497 for the period in question. (See, 390 TT.S. 468, at n.6.) Because of the differences noted above and explained below, we are of the opinion that the decision by the Supreme Court in Peoria in no way provides a basis upon which interest may be granted here.
The Peoria case is first distinguished by the fact that here we are dealing with an unconscionable consideration case, whereas the Peoria case involved a breach of a specific treaty. In Peoria there was a breach of the specific obligation to sell the lands of the Peoria Tribe at public auction and damages were awarded for that breach, while here there was no such breach of a treaty. In this case we are not concerned with damages for a specific breach and, therefore, the primary basis upon which interest (or damages, depending upon the interpretation of the Supreme Court’s opinion in Peoria) was awarded in Peoria does not exist in this case.
The second and more significant difference is in the specific agreements to pay interest. Contrast the following Article 7 of the Treaty of 1854 which granted the Peoria Tribe interest with Article 3 of the Act of August 15,1894, quoted earlier in reference to the Nez Perce Tribe:
And as the amount of the annual receipts from the sales of their land's, cannot now be ascertained, it is agreed that the President may, from time to time, and upon consultation with said Indians, determine how much of the net proceeds of said sales shall be paid them, and how much shall be invested in safe and profitable stocks, the interest to be annually paid to them, or expended for their benefit and improvement.
By comparison it becomes clear to us that the provision for interest in the case of the Peoria treaty was of a nature that could support a decision to pay interest on any additional sum awarded, while the provision in point as to the Nez Perce Tribe was not so loosely worded as to tolerate interest being paid on any more than the original amount contained in the agreement. In other words, the government in the Nez Perce case did all it promised; i.e., the agreement was not an open-ended transaction and it was fully complied with.
*498 Tn conclusion, we get no belp from the Peoria case for a conclusion that interest may be granted in this case. Furthermore, we feel that the differences in the two cases, especially concerning the agreements to pay interest, and the basis upon which damages were awarded in Peoria, all distinguish our case from Peoria. We shall, therefore, move on to a discussion of the alternative argument made in favor of awarding interest.
The Tribe has argued that since the Indian Claims Commission awarded additional consideration in this case it is inconsistent not to also award additional interest. Stated somewhat differently, the Tribe argues that since the Indian Claims Commission has the power to revise treaties, contracts, and agreements (clause 3, of section 2, Act of August 13, 1946, 60 Stat. 1049 (Indian Claims Commission Act)) that, therefore, the Commission must also have the power to revise that portion of an agreement which grants interest. The Tribe pursues this approach by asserting that the Commission so revised the agreement in question and that revision is completely within its power.
In response to the aforementioned argument, we must first refer to our earlier opinion, 176 Ct. Cl. 815 at 829-830, where we discussed the interest question. As we stated previously, we are unable to say with certainty that had the total consideration originally been $3,022,575 instead of $1,626,222, the government would have agreed to put more than one million dollars into the interest earning account. Furthermore, even if we were inclined to agree that this result most logically would have followed from the larger amount, we are unable to support a judgment for interest on that type of reasoning. While it may be consistent to raise the total interest payment in accordance with the increase in the principal consideration, it is without a clear manifestation of intent by the government to pay interest, and without such we cannot act. 28 TJ.S.C. § 2516(a) (1964). We admit that this position may be classified as a strict approach but in view of previous experiences we feel this is our only alternative. United States v. Thayer-West Point Hotel, 329 U.S. 585 (1947), r’vg in part, 106 Ct. Cl. 60, 64 F. Supp. 565 (1946); Con *499 federated Salish & Kootenai Tribes v. United States, 175 Ct. Cl. 451, cert. denied, 385 U.S. 921 (1966); United States v. Omaha Tribe of Indians, 253 U.S. 275 (1920), aff'g in part, 53 Ct. Cl. 549 (1918).
In conclusion on this point we must note that it is our opinion that whereas the Indian Claims Commission Act, 60 Stat. 1049, section 2, clause 3 (25 U.S.C. § 70a) allows for additional consideration when one of the enumerated grounds is found to exist, it does not allow, as the Tribe would have us hold, the Commission to rewrite the agreement so as to provide for additional interest. The section in question reads as follows:
(3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; * * *. [25 U.S.C. § 70a]
In our opinion, Congress did not intend by the formulation of the above provision to give the Commission the broad power advocated by the Tribe in this case. See, The Loyal Band of Creek Indians v. United States, 118 Ct. Cl. 373, 383, 97 F. Supp. 426, cert. denied, 342 U.S. 813 (1951); The Osage Nation of Indians v. United States, 119 Ct. Cl. 592, 671, 97 F. Supp. 381, cert. denied, 342 U.S. 896 (1951). We must, therefore, stand firm in our conclusion that in order to award interest there must be express authority for doing so either by a written agreement or an act of Congress (28 U.S.C. § 2516(a)), and such authority does not include a hypothetical revision of an agreement which is based upon speculation as to what the parties might have done.

II. Damages for Trespass

Counsel for the Tribe, during oral argument, brought the court’s attention to one facet of the case to which neither the Commission nor this court has previously addressed itself. That point is in reference to a portion of the original amount paid to the Tribe and specifically refers to $.50 per acre which *500 was paid for all previous trespasses by the whites upon the lands of the Nez Perce Tribe.
The original brief filed on behalf of the Tribe dealt generally with the question of consideration paid and whether or not the discrepancy between the amount paid and the true fair market value was so gross as to be unconscionable. In that overall presentation the court’s attention was directed to the argument that because $.50 per acre of the total amount paid was paid for trespasses and not as consideration for the sale of land, that this fact increased the aforementioned discrepancy. On the present appeal the brief for the Tribe now carries the above argument one step further; the position now advocated for the first time is that the $.50 per acre paid as damages for trespass should not be included in the amount deducted from the final award as determined by the Indian Claims Commission. This position would call for an increase in the total award granted to the Tribe of approximately $274,780. This result is computed by starting with the fair market value for the ceded lands as finally determined using the $5.50 figure (549,559 acres times $5.50 equals $3,022,575). From this figure the Commission deducted the amount originally paid ($1,634,664) to arrive at the total difference of $1,387,911 which is the additional sum found to be due the Tribe. The increase to which the Tribe refers results by reducing the $1,634,664 (amount originally paid) by $274,780; when the resulting figure ($1,359,884) is subtracted from the total amount found to be due the Tribe ($3,022,575) the new award would be $1,662,691. However, for the following reasons we do not decide the correctness or incorrectness of the Tribe’s position.
As stated earlier, the original position of the Tribe was that this $.50 difference contributed to the discrepancy between the actual fair market value and the amount paid as consideration for the ceded lands. This argument strengthened the Tribe’s position as to the unconscionability of the difference as determined at the first hearing before the Indian Claims Commission. It was not illogical, therefore, that the *501 Tribe included the damages argument in its brief to this court following the first decision of the Indian Claims Commission. Subsequently, we decided that the Commission should reconsider their determination as to fair market value (116 Ct. Cl. 815, supra). However, prior to the second hearing by the Commission pursuant to our remand, the Tribe asked this court to reconsider our first decision. That motion for rehearing, filed September 16, 1966, did not mention the above damages argument in any form. Thereafter the Tribe pursued their case to the Commission.
Having finally convinced the Commission at the second hearing that the lands were worth more than the $4.00 figure originally arrived at, and that they were entitled to recover an additional sum, the Tribe then became the appellee in this court. In their brief to this court as appellee the Tribe once again raised the damages issue. This time, however, it included a new plea that the $.50 per acre should not be included when deducting the amount originally paid from the amount finally determined to be due the Tribe. This new approach was included even though the Commission, in its second decision, did not discuss the $.50 per acre question. Furthermore, as stated earlier, the Tribe did not-cross-appeal on this aspect of the case.
It is, therefore, the opinion of this court that only after the total consideration was increased did plaintiffs restructure the argument concerning the damages for trespass and at that point it was much too late. Consequently, we are of the opinion that the Tribe, having raised this argument in its present form only after the second opinion of the Indian Claims Commission from which they do not appeal, did not make a timely claim and are, therefore, not entitled to recover on this issue. McCauley ex rel. Kaw Tribe of Indians v. United States, 125 Ct. Cl. 628, 113 F. Supp. 689 (1953); Snake or Piute Indians of Former Malheur Reservation in Oregon v. United States, 125 Ct. Cl. 241, 112 F. Supp. 543 (1953); Saginaw Broadcasting Co. v. Federal Communications Commission, 96 F. 2d 554 (1938), cert. denied, 305 U.S. 613 (1938).

*502
III. The India/n Claims Commission's Determination of Fair ■Market Value

As was noted at tbe onset of this opinion, we are now reviewing this case for tlie second time. Our initial review (176 Ot. 01. 815) concluded that the case should be remanded to the Commission because we felt, after considering all the facts, that the initial figure of $4.00 per acre as the maximum fair market value was not supported by substantial evidence. We did not say that the $4.00 per acre determination was totally unsupportable, but, 'as we stated in our first opinion, such valuation seemed to us to be merely at the threshold of the actual value and, therefore, not supportable as the most realistic amount:
* * * We are of the view that there is substantial evidence in the record indicating a value of $4 per acre, but unlike the Commission, we think this is a minimum figure. [176 Ct. Cl. 815,819]
To reiterate, we think that the $4 per acre figure is supported by substantial evidence. It is, however, at the threshold, and not at the ceiling as the Commission determined. We think the overwhelming weight of the evidence shows that the Commission should have found the $4 figure to be the minimum. [176 Ct. Cl. 815, 825-826] * * * That is to say, we believe that no reasonable seller in a willing transaction under any circumstances would have parted with ownership of the ceded area for less than $4 per acre. So on the facts of this case, the “legitimate” margin is not between $2.97 and $4, but between $4 and something greater. [176 Ct. Cl. 815, 829]
As a consequence of our determination as to the $4 maximum value being unsupportable, we remanded the case to the Commission with instructions to reconsider the evidence as presented and look to “some higher, unstated value in resolving the ‘unconscionable consideration’ issue.” (176 Ct. Cl. 815 at 828.) We do feel that pursuant to this remand the Commission was not compelled to find a higher value and could have resolved any difficulties we may have had with their initial conclusion by restating that the $4 figure was not only the minimum but also the maximum that could be found. Nevertheless, the Commission did not stand by its initial finding but instead it chose to increase the average fair market value to $5.50 per acre. In so doing, the Commission *503 gave us no indication by way of findings as to bow they arrived at this new figure. (The Commission merely changed the figure from $4 to $5.50.) Because of this gap we must again remand the case.
It should be pointed out that as of now we have no quarrel with this new amount arrived at by the Commission; in fact, we feel that this is probably much more realistic than the initial finding. However, it is our function to review the decisions of the Commission (25 U.'S.C. § 70s) and we can do this only by the standards set forth in the statute granting us the power to review. (Indian Claims Commission Act, supra.) That statute tells us we should review the findings to determine if the ultimate conclusion is supported by substantial evidence. Thus, when we have only an ultimate conclusion, without the aid of specific findings or reasons which lead up to that conclusion, we are powerless to determine whether that conclusion is supported by substantial evidence. Snake or Piute Indians of Former Malheur Reservation in Oregon v. United States, 125 Ct. Cl. 241, 112 F. Supp. 543 (1953).
Counsel for the Tribe explains that the Commission arrived at this conclusion after considering all the evidence previously presented and then making a so-called “jury verdict” or “intuitive leap.” This “leap” occurred after reconsidering all the evidence presented on the first hearing which is the same evidence used by the Commission to make the initial determination of $4 per acre. It is entirely possible and quite conceivable that such findings alone could support the new value as determined by the Commission. However, we do believe that when Congress directed that reasons be given for the findings and conclusions (25 U.S.C. §70r(3)) it contemplated a more detailed and specific display of analysis than what we have in the second determination of fair market value by the Indian Claims Commission.
Accordingly, the decision of the Indian Claims Commission is reversed as to the interest question, and the case is remanded for further proceedings in conformity with this opinion; i.e., to supply specific findings with respect to the $5.50 figure.

Reversed and remanded.

 22 Ind. Cl. Comm. 53 (Nov. 14,1969).

 Clause (3) of section 2 of the Indian Claims Commission Act, 60 Stat. 1049,1050 (1946) provides, as follows :
“The Commission shall hear and determine the following claims against the united States on behalf of any Indian tribe * * * : (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, [or] unconscionable consideration * *

 The original reservation consisted of approximately 762,000 acres. After the individual Indians were given first choice and the Tribe received trust funds there remained 549,559 acres which were ceded to the government.

 In our first opinion we also considered the fairness of the dealings pursuant to section 2, clause (5) of the Indian Claims Commission Act, 60 Stat. 1049. Neither party having appealed our decision as to that issue, we did not consider it on this appeal.

 Tie original agreement of May 1, 1893 was ratified and approved by section 16 of the Act of August IB, 1894, 28 Stat. 286, 326.

 See, 22 Ind. Cl. Comm. 53, 66 (1969).